757 S.E.2d 422

**Laura RILEY, as the Personal Representative of the Estate of Benjamin Riley, Respondent,**

v.

**FORD MOTOR COMPANY, Appellant.**

**Appellate Case No. 2012–207489.**

**No. 5195.**

Court of Appeals of South Carolina.

Heard Sept. 11, 2013.

Decided Feb. 5, 2014.

Rehearing Denied April 3, 2014.

Certiorari Granted Sept. 24, 2014.

2

Curtis Lyman Ott and Laura Watkins Jordan, both of Gallivan, White & Boyd, PA, of Columbia; Joseph Kenneth Carter, Jr., Carmelo Barone Sammataro, and David Christopher Marshall, all of Turner Padget Graham & Laney, PA, of Columbia, for Appellant.

Ronnie Lanier Crosby, of Hampton, and Daniel E. Henderson and Matthew Vernon Creech, of Ridgeland, all of Peters Murdaugh Parker Eltzroth & Detrick, PA, for Respondent.

FEW, C.J.

Jasper County Sheriff Benjamin Riley's estate ("the Estate") brought this products liability lawsuit against Ford Motor Company after Riley was ejected from his 1998 Ford F–150 pickup truck in an accident and killed. The Estate settled with the at-fault driver before trial, and the jury awarded $300,000 against Ford. We affirm the trial court's denial of Ford's motion for judgment notwithstanding the verdict (JNOV). However, we reverse the denial of Ford's motion for setoff and the granting of the Estate's motion for new trial *nisi additur*.

## I.  Facts and Procedural History

On August 29, 2007, Riley was driving his Ford F–150 pickup truck near Ehrhardt in Bamberg County when a vehicle driven by Andrew Marshall Carter II pulled from a side road into Riley's lane of travel. The resulting impact caused Riley's truck to leave the road and roll over. The

driver's door of the truck opened in the initial collision with Carter, and Riley was ejected through the open door. First responders found Riley's body eighty-five feet from where he was ejected.

Riley's wife Laura, serving as personal representative of the Estate, brought wrongful death and survival claims against Ford and Carter. The claims against Ford were based on a products liability negligence theory. Specifically, the Estate alleged Ford's negligent design of the door-latch system in Riley's truck allowed the door to come open, and Riley would not have died if he had not been ejected. The Estate settled with Carter for $25,000, with the Estate and Carter agreeing to allocate $20,000 to the survival claim and $5,000 to the wrongful death claim. The trial court approved the settlement.

At trial, the Estate withdrew its survival claim, and the court submitted the wrongful death claim against Ford to the jury. The jury returned a verdict in favor of the Estate for $300,000 in actual damages.

Ford moved for JNOV, arguing the Estate failed to prove both the existence of a defect in the door-latch system and a reasonable alternative design. Ford also requested a setoff from the verdict in the amount of $25,000 to account for the Estate's settlement with Carter. The trial court denied both motions in a form order without explanation.

The Estate filed a motion seeking a new trial *nisi additur*. At the hearing on the motion, the trial court stated that a "$300,000 [verdict] for this type of case could very well be found to be shockingly inadequate" "because of the stature of [Riley] and what he's done in life, what he's contributed to his family." The trial court granted the motion and ordered Ford to pay "an additional $600,000 in actual damages ..., bringing the total verdict to $900,000." Ford appeals each of these three rulings.

## II.   Ford's JNOV Motion

Ford raises in its brief three arguments as to why the trial court erred in not granting Ford's motion for JNOV: (1) the Estate did not present sufficient evidence of a design defect, but relied on the "mere failure" of the door latch; (2) the

Estate did not prove the existence of a reasonable alternative design as required by *Branham v. Ford Motor Co.*, 390 S.C. 203, 220, 701 S.E.2d 5, 14 (2010); and (3) the Estate did not present adequate expert testimony to prove a design flaw or a reasonable alternative design.[1] At oral argument, Ford presented more detail for its argument that the Estate did not satisfy the requirements of *Branham*. We hold the trial court correctly denied Ford's motion for JNOV.

## A. Reasonable Alternative Design

■ We begin by addressing Ford's argument that the Estate did not satisfy the requirements of *Branham*. In *Branham*, the supreme court noted that "South Carolina . . . [has] traditionally employed two tests to determine whether a product was unreasonably dangerous as a result of a design defect: (1) the consumer expectations test and (2) the risk-utility test." 390 S.C. at 218, 701 S.E.2d at 13. The court held, however, that "the consumer expectations test . . . is ill-suited in design defect cases," 390 S.C. at 220, 701 S.E.2d at 14, and adopted the risk-utility test as "the exclusive test in a products liability design case." *Id.* The court held that to satisfy the risk-utility test, a plaintiff must meet the "requirement of showing a feasible alternative design." *Id.* The court explained the requirement: "The very nature of feasible alternative design evidence entails the manufacturer's decision to employ one design over another. This weighing of costs and benefits attendant to that decision is the essence of the risk-utility test." 390 S.C. at 223, 701 S.E.2d at 16. Summarizing its holding, the court stated:

> [I]n a product liability design defect action, the plaintiff must present evidence of a reasonable alternative design. The plaintiff will be required to point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous.

---

1. Each of these arguments is stated within one of Ford's issues on appeal:

   Did the trial court err in submitting the case to the jury and denying Ford's motion for judgment notwithstanding the verdict when, as a matter of law, Ford's design was not defective or unreasonably dangerous because the Estate failed to present expert testimony of either a design flaw beyond mere failure or an alternative feasible design that was crashworthy?

This presentation of an alternative design must include consideration of the costs, safety and functionality associated with the alternative design.

390 S.C. at 225, 701 S.E.2d at 16.

█ We find the Estate met the requirements of *Branham* by presenting evidence of Ford's own alternative design for a door-latch system, which Ford used in F-150 trucks manufactured before Riley's 1998 model, and which Ford originally incorporated into the design of the 1998 model.

To explain our finding that the Estate met the requirements of *Branham*, we first describe the mechanics of two door-latch systems—the rod-linkage system and the cable-linkage system. Riley's 1998 F-150—which Ford internally called the PN96—contained a rod-linkage door-latch system. According to the evidence presented in this case, a rod-linkage system contains a metal rod that connects the door handle to a latch. When a person pulls the door handle, the rod activates the latch, which causes the door to open. The type of rod-linkage system in Riley's PN96 is a compression rod system, in which the action of pulling the door handle pushes the rod, or "compresses" it, to activate the latch and cause the truck door to open. The Estate presented evidence that when a vehicle containing a compression rod system is involved in a frontal collision such as this one, the force of the collision may cause "foreshortening"—a decrease in the distance between the handle and the latch,[2] which in turn compresses the rod as though a person pulled the handle. When a certain amount of foreshortening occurs, the rod may activate the latch and allow the door to open without the handle being pulled.

The Estate presented evidence that at the time Ford manufactured the PN96, Ford was also using a different door-latch system in other models—the cable-linkage system. As the Estate's mechanical engineering expert, Andrew Gilberg, explained, "you can't push on a cable and cause the latch to release." For this reason, the cable-linkage system prevents the effects of foreshortening during collisions—doors opening

---

2. Reading from a Ford document on how to design door-latch systems, a Ford engineer defined foreshortening as "the relative movement between the release handles and the latch due to vehicle crash deformation."

without a person pulling the handle. According to Ford witnesses and internal documents, Ford originally designed the PN96 to contain a cable-linkage system.

Gilberg testified the door latch on Riley's PN96 activated during the collision due to foreshortening, which allowed the door to open. According to Ford's own internal documents, the compression rod system in a PN96 allowed the door latch to activate with only 12 millimeters of foreshortening. Gilberg testified he was "100 percent confident that the latch reached the trigger point" and allowed the door to open during the crash. Although Gilberg measured the post-crash foreshortening in Riley's PN96 to be 11.58 millimeters, he explained that the elasticity of the "all steel structure[ ]" of the truck caused "spring-back" after the collision, which made the post-crash measurement less than what it actually was when the crash occurred.

According to Gilberg's testimony, the cable-linkage system was a safer design and had "[n]o safety risks associated with [it]." Gilberg testified the cable system "was clearly more crashworthy" and prevented "unwanted door opening due to foreshortening" in frontal collisions. Ford's own internal documents established that it knew compression rod systems "have a tendency to unlatch during crash if doors are crushed beyond a certain limit," and cable systems "provide a solution to this problem." In 1989, Ford conducted two frontal crash tests on F–150s that had rod-linkage systems, and the test results indicated that doors opened upon impact. Gilberg testified this occurred due to "compression of the door—the same thing that opened the door in Sheriff Riley's vehicle." Based on these crash test results, the Estate asserted Ford installed a cable system in the 1992–1995 F-series instead of the rod system because the cable system prevented the effects of foreshortening and the resulting "unwanted door opening" in frontal collisions. Ford continued to crash test the F-series trucks once the cable systems were installed, and the results showed no doors opened due to foreshortening.

Despite the safety advantages associated with cable systems, Ford changed its original design for a cable-linkage system in the PN96 and incorporated the compression rod system. Ford asserts it made the change because it discover-

ed water could invade the cable-linkage system and freeze the cable, preventing the door from opening. Ford produced evidence that it recalled the 1992 F–150 series trucks for this reason. Thus, Ford argues that although it used the cable system in the PN96's predecessor models, it was not "feasible" in the PN96 due to the cable freezing issue.

The record does not support Ford's assertion. One of Ford's engineers testified that by 1993, Ford corrected the freezing cable concerns. This is corroborated by a study conducted by Ford in 1994, which sought to determine whether cable systems were "a viable alternative to rod systems." The report generated from the study stated that "freezing cable concerns [have been] corrected." In fact, Ford's engineers advocated for the use of cables once the problem was fixed.

The Estate's primary evidence establishing the reasonableness and feasibility of the cable-linkage system was the fact that Ford designed, manufactured, and sold F150 trucks with the cable-linkage door-latch system only three model years before Riley's PN96. In addition, the Estate presented extensive evidence concerning Ford's cable-linkage design. According to the report of the 1994 study, the advantages of cables, when compared to rods, included: (1) packaging—"[c]able systems require less package space"; (2) safety—"[c]able systems are more robust to crash"; (3) performance—"[c]able systems provide better performance to the customer"; and (4) manufacturing—"[c]able systems are easier for assembly plants to handle," "are tolerant to build variations between latch and handle," "reduc[e] cost and reduc[e] operator dependence," and "reduce[ ] complexity in service." The only disadvantage indicated by the report was that "[c]able systems are from two to three times as expensive as rods," costing $9.00 per door instead of $4.25 per door if Ford used a rod system. A second report Ford produced sometime after 1993, which compared rod and cable systems, concluded cable systems "improved quality," were "easier to install," and were more "[r]obust to door foreshortening." The only disadvantage listed was "higher cost"—"$0.85/door more than rods."

These reports demonstrate Ford conducted its own risk-utility analysis. Specifically, Ford "consider[ed] . . . the costs,

safety and functionality associated with the alternative design," *Branham,* 390 S.C. at 225, 701 S.E.2d at 16, and concluded the cable-linkage system was a feasible, if not superior, alternative design to the compression rod system.

We find the Estate presented ample evidence of a reasonable alternative design. This evidence supports a finding that "the increased costs ... of altering the design [to incorporate a cable-linkage system] would have been worth the resulting safety benefits," and thus satisfies the risk-utility test. *See* 390 S.C. at 224, 701 S.E.2d at 16 (explaining the central inquiry of the risk-utility test, quoting David G. Owen, *Toward a Proper Test for Design Defectiveness: "Micro–Balancing" Costs and Benefits,* 75 Tex. L.Rev. 1661, 1687 (1997)). We find the Estate met the requirements of *Branham.*

However, Ford makes other arguments based on *Branham,* which we address in turn.

First, Ford argues the Estate did not meet the requirements of *Branham* because it failed to prove a specific design flaw in the compression rod system of the PN96. Relying on the *Branham* court's statement that a plaintiff must "point to a design flaw in the product," 390 S.C. at 225, 701 S.E.2d at 16, Ford argues the Estate never identified a defective feature of *this* particular rod system. In support of this argument, Ford asserts it is not enough for the Estate to present evidence showing the compression rod system in the PN96 allowed the door to open with only 12 millimeters of foreshortening and that a different system would have prevented this from occurring. Rather, Ford argues, *Branham* required the Estate to prove how a specific feature of this rod-linkage system allowed the door to open, and then offer a design alternative to that feature.[3] Ford argues the Estate cannot meet the requirements of *Branham* by simply proving another door latch system would have prevented the product from

---

3. Ford argued in its brief that Gilberg "failed to specify the facet of Ford's rod-linkage system that was, in his opinion, a design flaw." At oral argument, Ford stated Gilberg "doesn't explain how we improperly implemented" a rod design, and suggested the Estate could have met the requirement Ford reads into *Branham* by proving "this rod was ... defectively designed because it was ... in the wrong place, ... not the right size," or "manufactured [with] the wrong material."

being unreasonably dangerous and that Ford could have prevented Riley's death by using the other system.

We find Ford has misinterpreted the statement from *Branham*—that the plaintiff must "point to a design flaw in the product." *Id.* This statement relates to the plaintiff's burden of proving a reasonable alternative design, not the requirement of proving the existence of a design defect,[4] which the *Branham* court addressed in detail in another section of the opinion. *See* 390 S.C. at 212–18, 701 S.E.2d at 10–12. The statement merely sets up the requirement of a reasonable alternative design by noting that a plaintiff must identify the design feature for which an alternative is offered. We find the Estate met the requirements of *Branham* because the Estate (1) "point[ed] to a design flaw in the product"—the vulnerability of the PN96's compression rod system to foreshortening, which allowed the door to open during the collision without the handle being pulled—and (2) "show[ed] how [the cable-linkage system] would have prevented the [PN96] from being unreasonably dangerous." 390 S.C. at 225, 701 S.E.2d at 16.

■ Second, Ford argues the Estate failed to meet the requirements of *Branham* because it did not offer an expert who would "champion" the cable-linkage system. This argument by Ford is based on Gilberg's testimony that "there is nothing inherently wrong with rods." We find no basis in *Branham*, or in any other authority, for Ford's argument that an expert must "champion" an alternative design.

■ Finally, Ford claims the Estate did not propose an alternative design that would have prevented the product from being unreasonably dangerous in all foreseeable collisions. It argues Gilberg's analysis of the crashworthiness of the cable system was limited to this particular accident involving Riley because he was "unwilling to say that the [cable-linkage system] as a whole [wa]s a good design for all reasonably

---

4. A plaintiff must, of course, prove the existence of a design defect. *See Graves v. CAS Med. Sys., Inc.*, 401 S.C. 63, 79, 735 S.E.2d 650, 658 (2012) (reciting the elements of a design-defect products liability claim, including "the injury occurred because the product 'was in a defective condition . . .' " (quoting *Madden v. Cox*, 284 S.C. 574, 579, 328 S.E.2d 108, 112 (Ct.App.1985))). The Estate's evidence proving the door latch system of the PN96 was in a defective condition is addressed in section II.B.

foreseeable crashes." However, the law of crashworthiness does not require the Estate to prove its alternative design would have prevented the door from opening in *every* foreseeable collision. Instead, the law required the Estate to prove (1) the design of the rod system in Riley's PN96 "created an unreasonable risk of injury" that was "readily foreseeable as an incident to the normal and expected use of [the] automobile," *Mickle v. Blackmon*, 252 S.C. 202, 228, 232, 166 S.E.2d, 173, 184, 186 (1969), and (2) the cable system "would have prevented the product from being unreasonably dangerous." *Branham*, 390 S.C. at 225, 701 S.E.2d at 16. We find the Estate met these requirements.

## B. Design Defect

■ Ford argues the Estate did not present sufficient evidence that the door-latch system in Riley's PN96 was defective because the Estate relied on the mere fact that the door opened in the accident as evidence of a defect. *See Graves v. CAS Med. Sys., Inc.*, 401 S.C. 63, 80, 735 S.E.2d 650, 658–59 (2012) (holding a plaintiff cannot rely on "the mere fact [that] a product failed," but "must offer some evidence beyond the product's failure itself"); *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 543, 462 S.E.2d 321, 328 (Ct.App.1995) (stating "the mere fact that a product malfunctions does not demonstrate the manufacturer's negligence nor does it establish that the product was defective"). We disagree.

In addition to the evidence discussed in section II.A., Gilberg testified extensively about what constitutes a safe door-latch design and, specifically, the safety of the door-latch design in the PN96. He stated the PN96 "did have a design defect" that caused the door to unlatch in this accident. He went on to testify "why it is that [he] believe[d] Sheriff Riley's F–150 had a design defect." He testified the door of Riley's truck "came open without damage to the latch," which "shouldn't have happened." He explained this was the basis for the design defect because the particular rod-linkage system in Riley's truck allowed the door to unlatch due to a "very small amount of longitudinal crush ... [of] the door." When asked on cross-examination whether the mere use of the rod-linkage system itself rendered the truck defective, he responded, "No sir. What renders it defective is that it fails without

even stressing the latch." Gilberg explained this is because a compression rod-linkage system is "sensitive to longitudinal crush" in that "[i]f the door is crushed longitudinally as little as one inch," the door will open.

Ford relies heavily on *Graves,* but we find that reliance to be misplaced. In *Graves,* the supreme court affirmed the circuit court's exclusion of all the plaintiff's computer experts, 401 S.C. at 78, 735 S.E.2d at 657, leaving the plaintiff with no evidence whatsoever as to how, or even whether, the product malfunctioned. 401 S.C. at 79, 735 S.E.2d at 658. Thus, the plaintiff in *Graves* did not prove a failure, and also did not prove any defect that could have caused a failure. In this case, the failure was that the door opened when no person pulled the handle. The defect that caused the failure was a door-latch system that did not protect against foreshortening, and allowed the door to open when it should not have—with only "a very small amount of longitudinal crush." Through its expert and through Ford's witnesses and documents, the Estate presented extensive evidence of how and why the design of the door-latch system in the PN96 was defective. This case is readily distinguishable from *Graves.*

### C. Expert Testimony

Finally, Ford argues "the Estate failed to present expert testimony of either a design flaw beyond mere failure or an alternative feasible design that was crashworthy." Much of the evidence we discussed in sections II.A. and B. came directly from the testimony of the Estate's mechanical engineering expert, Gilberg. We find Gilberg's testimony on the existence of a design defect and a reasonable alternative design required the denial of Ford's motion for JNOV.

### III. Ford's Motion for Setoff

Ford also argues the trial court erred in refusing to grant a setoff to account for the $25,000 Carter paid the Estate to settle the claims against him. *See Rutland v. S.C. Dep't of Transp.,* 400 S.C. 209, 216, 734 S.E.2d 142, 145 (2012) ("A non-settling defendant is entitled to credit for the amount paid by another defendant who settle[d] for the same cause of action."). The Estate in its brief "acknowledges that Ford is entitled to a $5,000 setoff representing that portion of the

prior settlement allocated to wrongful death," and thus concedes the trial court erred in part by refusing to grant any setoff. The Estate argues, however, that Ford is not entitled to any of the $20,000 the Estate and Carter allocated to the survival claim because there was "ample evidence" showing Riley suffered conscious pain and suffering. *See Vereen v. Liberty Life Ins. Co.*, 306 S.C. 423, 432, 412 S.E.2d 425, 431 (Ct.App.1991) (stating a survival action exists when "there is any evidence from which a jury could reasonably conclude a decedent experienced conscious pain and suffering"). The Estate essentially argues the trial court should have accepted the allocation of settlement funds it agreed upon with Carter, despite the fact Ford did not participate in those negotiations. Ford argues, on the other hand, it is entitled to a credit for the entire $25,000 because of "an undisputed lack of evidence" of conscious pain and suffering.

■■ We disagree with both the Estate and Ford. We find there is some evidence that Riley suffered consciously, and hold both parties were entitled to have the trial court analyze the proper allocation of the settlement and make findings of fact on the record as to whether, and if so how, the remedy of setoff should be applied to the facts of this case. Because the trial court's form order denying setoff reflects no analysis, and because the Estate concedes Ford is entitled to at least $5,000, we reverse the trial court's decision to deny any setoff. Because we find the record is sufficient to allow this court to engage in the required analysis, we decide the question without remand. *See Church v. McGee*, 391 S.C. 334, 342, 705 S.E.2d 481, 485 (Ct.App.2011) (stating setoff is equitable in nature, and thus an appellate court may find facts in accordance with its own view of the preponderance of the evidence).

In this crashworthiness action, the Estate has no claim against Ford for Riley's injuries resulting solely from the initial impact with Carter. Rather, the Estate's claim against Ford is limited to the enhanced injuries—in this case, Riley's death—that resulted from the alleged negligent design of the door-latch system that allowed Riley to be ejected. *See Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 452 (4th Cir.2001) (applying South Carolina law) ("Under the crashworthiness doctrine, liability is imposed not for defects that cause collisions but for defects that cause injuries after collisions

occur."). Thus, the Estate's theory against Ford necessarily depends on Riley being alive after the initial collision because if Riley died before he was ejected, Ford's negligent design of the door-latch system could not have proximately caused his death. The jury's verdict against Ford, therefore, requires a finding that Riley was alive after the collision with Carter. Additionally, the first witness to arrive at the scene of the accident testified that when he looked for the ejected driver of the pickup, he "heard something in the bushes," saw Riley on the ground, and heard "a gasping sound." Though it is minimal, we find the existence of some evidence to support a survival action against Carter.[5]

It makes sense, therefore, that the Estate and Carter allocated some portion of the settlement to the Estate's survival claim, particularly when Carter alone is liable for any pain and suffering Riley endured consciously before he was ejected from the truck. However, the minimal evidence of survival damages in this record does not support an allocation of eighty-percent of the settlement to the survival claim. This is particularly true because Carter is jointly liable for all of the wrongful death damages. Moreover, Ford was not a party to the settlement negotiations between the Estate and Carter, and thus is not bound by their agreement. *See Welch v. Epstein*, 342 S.C. 279, 313, 536 S.E.2d 408, 426 (Ct.App.2000) (holding a defendant who is "not a party to the settlement . . . is not bound by its terms" when requesting setoff).

██ The Estate would have us focus only on the amount of money Carter paid to settle the survival claim, and not on the percentage of the settlement allocated to one claim or the other. Doing so, the Estate argues, requires the conclusion that the $20,000 allocated to the survival action in its settlement with Carter was reasonable. We concede that $20,000 is not an unreasonable amount for Carter to pay to settle the survival claim on the facts of this case. We disagree, however, with the premise of the Estate's argument because allocating eighty-percent of the settlement to survival is not reasonable.

---

5. Funeral expenses are also recoverable in a survival action. *See* S.C.Code Ann. § 15-5-100 (2005) ("Damages recoverable under . . . [the survival statute] . . . may include reasonable funeral expenses . . . .").

We hold that in the context of a non-settling defendant's claim for setoff, the court should examine whether the percentages allocated to one claim or the other by the settling parties are reasonable. *See id.* If the allocation is not reasonable, the court may reallocate the funds.

*Rutland* supports a fair reallocation of the settlement by this court. In *Rutland,* the decedent died in a car accident, and the personal representative settled with the at-fault driver's insurance company and the automobile manufacturer for a total settlement of $305,000. 400 S.C. at 212, 734 S.E.2d at 143. The settling parties agreed to allocate $138,000 to a survival claim and $167,000 to wrongful death. *Id.* The plaintiff proceeded to trial against a third defendant only on the wrongful death claim. 400 S.C. at 213, 734 S.E.2d at 143. After the jury awarded the plaintiff $300,000 in actual damages, the trial court reallocated the entire amount of the settlement exclusively to wrongful death. *Id.* The supreme court found "no evidence of conscious pain or suffering," 400 S.C. at 214, 734 S.E.2d at 144, and affirmed the trial court's reallocation of the settlement. 400 S.C. at 217, 734 S.E.2d at 146. The court's finding of "no evidence" of pain and suffering meant there was no factual support for the agreed-upon allocation.

Although our finding of some evidence of conscious pain and suffering makes this case different from *Rutland,* we believe the reasoning of *Rutland* permits a reallocation of the settlement proceeds in this case. *Rutland* is based in part on the policy that "[c]ompensatory damages are intended to make the plaintiff whole." 400 S.C. at 217, 734 S.E.2d at 146. When an agreed-upon allocation of settlement proceeds is not reasonable under the evidence, that policy is not advanced because of the possibility of double recovery. *See id.; Hawkins v. Pathology Assocs. of Greenville, P.A.,* 330 S.C. 92, 113, 498 S.E.2d 395, 406 (Ct.App.1998) (stating "[t]he reason for allowing [setoff] is to prevent an injured person from obtaining a second recovery" (citation omitted)). Thus, when an agreed-upon allocation of settlement proceeds is not reasonably based on the evidence and does not fairly advance the policy of preventing double-recovery, a non-settling defendant who is entitled to a setoff but was not involved in the settle-

ment negotiation is entitled to have the court consider reallocating the proceeds.[6]

■ The minimal evidence of conscious pain and suffering in this case weighs in favor of allocating the majority of the proceeds to the wrongful death claim. However, the fact that Carter alone is liable for the pain and suffering Riley endured before being ejected weighs in favor of some portion being allocated to the survival claim. Further, settling parties must support the settlement agreement with consideration for the release of both claims. *See Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 241, 672 S.E.2d 799, 802 (Ct.App.2009) (stating "settlement agreements are viewed as contracts"); *Clardy v. Bodolosky*, 383 S.C. 418, 425, 679 S.E.2d 527, 530 (Ct.App. 2009) ("The necessary elements of a contract are an offer, acceptance, and valuable *consideration.*" (citation omitted) (emphasis added)). This also weighs in favor of some portion being allocated to the survival claim. Considering the entire record before us, we find that a fair allocation of the Estate's settlement with Carter is eighty-percent to the wrongful death claim and twenty-percent to the survival action. Thus, we find Ford is entitled to a $20,000 setoff from the jury's verdict.

## IV. The Estate's Motion for New Trial *Nisi Additur*

Finally, Ford argues the trial court erred by increasing the jury verdict from $300,000 to $900,000. We agree.

We begin our analysis of this issue by focusing on both parties' right to a trial by jury. Article I, section 14 of the South Carolina Constitution provides "[t]he right of trial by jury shall be preserved inviolate." The right to trial by jury is "guaranteed in every case,"[7] and includes the right to have

---

6. We use permissive language such as "may," "permit," and "consider reallocating" because setoff is an equitable remedy a court is not required to grant. *See Church*, 391 S.C. at 342, 705 S.E.2d at 485 (stating setoff is equitable in nature); *Siau v. Kassel*, 369 S.C. 631, 640, 632 S.E.2d 888, 893 (Ct.App.2006), *overruled on other grounds by Buffington v. T.O.E. Enters.*, 383 S.C. 388, 680 S.E.2d 289 (2009) (providing that all equitable remedies are "granted as a matter of sound judicial discretion, and not as a matter of legal right" (citation omitted)).

7. *Mims Amusement Co. v. S.C. Law Enforcement Div.*, 366 S.C. 141, 149, 621 S.E.2d 344, 348 (2005) ("The right to a trial by jury is

the jury determine the amount of damages. *See Hatchell v. McCracken*, 243 S.C. 45, 51, 132 S.E.2d 7, 10 (1963) (stating "[t]here [is] no question as to the legal right ... to have the amount of damages ... determined by a jury").

In potential conflict with this constitutional right, a trial court has the power to grant a motion for new trial *nisi additur* when the court determines the jury's verdict is inadequate in light of the evidence presented. *Bailey v. Peacock*, 318 S.C. 13, 14, 455 S.E.2d 690, 691 (1995). To balance "the wide discretion given to a trial judge in ruling on a new trial [*nisi additur*] motion," *Luchok v. Vena*, 391 S.C. 262, 264, 705 S.E.2d 71, 72 (Ct.App.2010), against a litigant's constitutional right to a trial by jury as to the amount of damages, our courts give "substantial deference ... to a jury's determination of damages," *id.*, and we require trial courts to "offer compelling reasons for invading the jury's province." *Green v. Fritz*, 356 S.C. 566, 570, 590 S.E.2d 39, 41 (Ct.App.2003) (*citing Bailey*, 318 S.C. at 14, 455 S.E.2d at 691).[8]

Thus, our analysis of the decision to grant *additur* must be made in deference to the jury's verdict, and turns on whether the trial court gave compelling reasons for invading the province of the jury. We agree with Ford that the court did not offer compelling reasons.

The trial court found it was "compelled to grant [*additur*] because every element of wrongful death damages was proven by the [Estate] and the $300,000 verdict d[id] not reflect the evidence on these issues." The court found the Estate presented "undisputed, uncontroverted evidence" of economic loss in the amount of $228,605. The Estate also presented evidence of a funeral bill for $10,196, which amounts to a total claim of economic loss of $238,801. As to noneconomic damages, the court found the Estate's "uncontested" evidence showed "the beneficiaries ... suffered each of the compensable elements of

guaranteed in every case in which the right to a jury was secured at the time of the adoption of the Constitution in 1868.").

8. *See also Todd v. Joyner*, 385 S.C. 509, 517, 685 S.E.2d 613, 618 (Ct.App.2008), *aff'd*, 385 S.C. 421, 685 S.E.2d 595 (2009); *Jones v. Ingles Supermarkets, Inc.*, 293 S.C. 490, 493, 361 S.E.2d 775, 777 (Ct.App.1987), *overruled on other grounds by O'Neal v. Bowles*, 314 S.C. 525, 527, 431 S.E.2d 555, 556 (1993).

[noneconomic] loss," and noted that these damages "were not only established, but shown to be significant through uncontested, emotionally compelling testimony." *See Scott v. Porter,* 340 S.C. 158, 168, 530 S.E.2d 389, 394 (Ct.App.2000) (listing the same elements of recoverable damages as are listed in the court's order). The court went on to summarize the testimony of Riley's family and friends, which the court found "showed that this family of beneficiaries, perhaps more than most wrongful death beneficiaries, suffered great loss" and "left no question as to the grief, emotional turmoil, and loss suffered." The court then concluded, "For all of the compelling reasons listed above, it is abundantly clear that the verdict in this case was inadequate, in light of the evidence present[ed] at trial, and a granting of *nisi additur* is appropriate."

By subtracting $238,801—the maximum amount of economic loss suffered by the Estate [9]—from the jury's verdict of $300,000, we can determine the jury awarded at least $61,199 in noneconomic damages. In essence, the trial court ruled that $61,199 in noneconomic damages was not enough. In other words, the jury awarded noneconomic damages, but the trial court disagreed as to whether the amount was sufficient. We find this is not a compelling reason to invade the province of the jury.[10] *See Krepps v. Ausen,* 324 S.C. 597, 608, 479

---

9. Ford does not concede these damages. However, Ford did not actively contest any element of the Estate's claim of economic loss, choosing instead to focus its efforts on the issue of liability. Many of the elements of the Estate's economic loss are in fact uncontested, such as Sheriff Riley's lost salary for the remainder of his existing term of office, and the funeral bill. However, the jury could have discounted other elements even though Ford did not actively challenge their values. For example, the Estate's claim for economic loss included lost salary after the Sheriff's reelection, and its expert economist testified the Estate lost household services in the approximate amount of $57,000. As Ford pointed out at oral argument, no elected official's reelection is certain, and no witness testified the expenses for lost household services were actually incurred. For these reasons, the jury could have awarded less than the amounts claimed for those items.

10. This case is different from those in which our court has affirmed the granting of *additur* when the jury altogether failed to award noneconomic damages. *See, e.g., Waring v. Johnson,* 341 S.C. 248, 255, 261, 533 S.E.2d 906, 910, 913 (Ct.App.2000) (finding "[t]he jury failed to make any award for other damages such as pain and suffering," which amounted to "compelling reasons ... justifying the grant of the *nisi additur*"); *Williams v. Robertson Gilchrist Constr. Co.,* 301 S.C. 153,

S.E.2d 290, 295 (Ct.App.1996) (stating "the trial court may not impose its will on a party by substituting its judgment for that of the jury").

As a general rule, the "determination of reasonable compensation for non[economic] damages ... is ... left to the jury's discretion." *Scott,* 340 S.C. at 169, 530 S.E.2d at 395. The assessment of noneconomic damages "turns on the facts of each case," *id.,* and the value of these damages "cannot be determined by any fixed yardstick." *Clark v. S.C. Dep't of Pub. Safety,* 353 S.C. 291, 310, 578 S.E.2d 16, 26 (Ct.App.2002) (citation omitted). Our civil justice system is built on the foundation that such determinations are to be made by juries, not judges. *See generally* 2 J. Kendall Few, *In Defense of Trial by Jury* 277–87 (1993) (stating, for example, "the judgment of twelve impartial [jurors] of the average of the community, applying their separate experiences of life to the solution of such doubts as may arise, is more likely to be wise and safe than the conclusion of any single judge" (quoting U.S. District Judge William H. Brawley of South Carolina in *Travelers' Ins. Co. v. Selden,* 78 F. 285, 287 (4th Cir.1897)) and "what individual can so well assess the amount of damages which a plaintiff ought to recover for any injury he has received [than] ... an intelligent jury?" (quoting Henry Peter Brougham's address to the English House of Commons (Feb. 7, 1828))).

Limiting our holding to the facts of this case, we find the jury awarded damages for noneconomic loss, and the trial court's mere disagreement with the jury's determination of the proper amount of those damages is not a compelling reason for granting *additur.* Therefore, we reverse the award of *additur* and reinstate the jury's verdict of $300,000.

## V. Conclusion

For the reasons explained above, we **AFFIRM** the trial court's decision to deny Ford's motion for JNOV, **REVERSE**

155–56, 390 S.E.2d 483, 484–85 (Ct.App.1990), *overruled on other grounds by O'Neal v. Bowles,* 314 S.C. 525, 431 S.E.2d 555 (1993) (finding the trial court's reason for granting *additur*—the jury disregarded the testimony about the funeral bill and noneconomic losses— was compelling); *Jones,* 293 S.C. at 493–94, 361 S.E.2d at 777 (affirming the granting of *additur* where the jury's award of actual damages equaled the exact amount of the plaintiff's economic loss, but no damages for proven noneconomic loss).

the decision to deny setoff, and **REVERSE** the decision to grant a new trial *nisi additur.* We reinstate the jury's verdict of \$300,000 and award a setoff against the verdict in the amount of \$20,000.

PIEPER and KONDUROS, JJ., concur.