# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Stephanie Irene Greene, Appellant.

Appellate Case No. 2014-000764

Appeal from Spartanburg County
J. Derham Cole, Circuit Court Judge

Opinion No. 27802
Heard February 15, 2018 – Filed May 23, 2018

**AFFIRMED IN PART, VACATED IN PART**

C. Rauch Wise, of Greenwood, for Appellant.

Attorney General Alan Wilson and Senior Assistant
Attorney General David Spencer, both of Columbia, and
Seventh Judicial Circuit Solicitor Barry J. Barnette, of
Spartanburg, for Respondent.

**JUSTICE KITTREDGE:** Appellant Stephanie Irene Greene appeals her convictions and sentences for homicide by child abuse, involuntary manslaughter, and unlawful conduct toward a child for the death of her infant daughter, Alexis. Appellant was sentenced to prison for twenty years for homicide by child abuse, five years concurrent for involuntary manslaughter, and five years concurrent for unlawful conduct toward a child. We affirm the homicide by child abuse and

unlawful conduct toward a child convictions and sentences, but we vacate the involuntary manslaughter conviction and sentence.

## I.

Appellant was Alexis's mother; she was Alexis's caretaker during her brief life. Alexis died from morphine poisoning when she was forty-six days old. Appellant, a former nurse, was addicted to many drugs. The State contended that Appellant's morphine addiction (as well as dependence on other drugs) caused Alexis's drug poisoning through breastfeeding. The jury convicted Appellant on all charges.

This appeal followed. Appellant has raised four issues: (1) whether the trial court erred in denying her motion for a directed verdict on all charges due to the State's failure to prove causation; (2) whether the trial court erred in denying her motion for a directed verdict on the homicide by child abuse charge due to the State's failure to prove she acted with extreme indifference; (3) whether the trial court erred in failing to instruct the jury that it could only return a guilty verdict on one charge; and (4) whether the trial court erred in failing to require the State to open fully on the law and the facts of the case. We address each of these issues in turn.

## II.

Appellant's first assignment of error is the trial court's failure to grant a directed verdict on all charges because the State allegedly failed to produce any evidence that the morphine found in Alexis came from Appellant's breast milk. Appellant ignores the "synergistic effect" of the morphine poisoning when considered along with Appellant's abuse of other drugs. We have carefully reviewed the evidence and, when viewed in a light most favorable to the State as our standard of review mandates, we find sufficient evidence to present all charges to the jury. *State v. Bennett*, 415 S.C. 232, 235, 781 S.E.2d 352, 353 (2016) (noting that when reviewing the denial of a directed verdict the Court must not weigh the evidence but must view it in the light most favorable to the State, for the Court is concerned only with the existence or nonexistence of evidence) (citations omitted).

The State's causation theory was Appellant consumed excessive amounts of central nervous system depressants, principally morphine,[1] while breastfeeding Alexis and these drugs passed through Appellant's breast milk, resulting in Alexis's death.

---

[1] While the State focused mainly on Alexis's morphine poisoning, the other central nervous system depressant abused by Appellant was Clonazepam.

The evidence at trial revealed that Appellant continuously took morphine—MS Contin—and other drugs while pregnant with Alexis and while breastfeeding her. Moreover, the evidence showed that Appellant took more morphine than her doctors prescribed. In addition, Appellant exclusively breastfed Alexis until approximately one week before her death. Appellant told investigators that she began supplementing with formula due to her new blood pressure medication; however, Appellant also told investigators that she breastfed Alexis extensively during the two nights immediately preceding Alexis's death. Thus, sufficient evidence was shown that Appellant took many drugs, including morphine, and breastfed Alexis.

In addition, the evidence presented at trial was sufficient to show that the morphine and Clonazepam found in Alexis came from Appellant's breast milk. Appellant contends there is no evidence to support a finding that Alexis's drug poisoning was the result of ingesting morphine through Appellant's breast milk. We disagree, for we find the evidence, when considered in its entirety, provides a substantial basis from which a reasonable juror could conclude Appellant's breast milk was the source of the morphine that killed Alexis. The record includes extensive scientific evidence on morphine and the synergistic effect when combined with other central nervous system depressants. This evidence included the varying rates of metabolism in adults, the absence of metabolism in infants, the transferability of morphine from a mother to her baby through breast milk, and the risks of infants ingesting morphine (and other drugs) from their mothers' breast milk.

Dr. David H. Eagerton, an assistant professor of pharmacology and founding faculty member at the Presbyterian College School of Pharmacy and the former chief toxicologist at the South Carolina Law Enforcement Division, provided considerable testimony. Part of that evidence included the warning accompanying MS Contin, which provides that morphine "passes into the breast milk":

> **Dr. Eagerton**: "Before taking MS Contin tell your healthcare provider if you have a history of it." It gives several histories. And then in bold again it says, "Tell your healthcare provider if you are pregnant or planning to become pregnant. MS Contin may harm your unborn baby. *If you're breastfeeding MS Contin passes into the breast milk and may harm your baby*."

(emphasis added).

Much of the scientific evidence addressed an infant's inability to absorb and process a drug like morphine:

**The State**:  And obviously the child died.  Obviously, it is consistent with that.  Through the breastfeeding and everything a child—can it metabolize drugs like an adult does?

**Dr. Eagerton**:  No, they don't.

**The State**:  If you would, tell the jury about that, especially a six-week-[]old.

**Dr. Eagerton**:  Okay.  Typically, whenever—just to kind of back up a little bit how—you have to understand what drugs do in your body.

Once—once you take them they don't stay there forever.  They go through a cycle.  And in pharmacology we use the acronym ADME absorption.  You have to get the drug into your system.  So how do you get it in there?  There's—there's lots of different ways.  You can—most things we're talking about now is you think of it orally.  But you can give it, you know, as a shot either just under your skin, in your muscle.  You can give it [in an] IV directly in your veins.  You can absorb some drugs through the skin, different things like that.  So you have different routes of administration depending on what you're trying to do and what the drug is.

Once you absorb it it's going to distribute throughout your body based on its chemical and physical properties, that is whether it likes water or whether it likes fat, or it distributes into one of those two areas in the body primarily.

Certain tissues may pick up drugs preferentially, things like that.  So it's going to distribute throughout your body.

Then the next step is metabolism, which is more correctly termed biotransformation.  Basically, your liver is responsible for that, and it has enzymes that develop over time that basically take these foreign compounds that you're taking and make it usually more

water [soluble], and the idea is to make it either less toxic or more readily excreted. But the idea i[s] to make it more readily—more water [soluble] typically so that it could be more readily excreted from your body. And that's the last stage[] of elimination. And it's eliminated—it's eliminated—most drugs are going to be once they're—especially once they've been metabolized and made more water [soluble] they're going to be eliminated throughout the water in your body—urine, feces, sweat, saliva, tears, things like that is how it's going to be eliminated primarily. There are other ways too.

**The State**: Does a six-week-[]old child metabolize at all?

**Dr. Eagerton**: No, not typically because it take[s] time[] for your liver to develop. It takes time for these—the genes that code for these enzymes to turn on and be expressed. And you don't—even a child doesn't metabolize things the same as an adult.

Usually you don't—whenever you go through puberty is whenever most of the things that are going to turn on for an adult is going to turn on.

And, in fact, it even goes the other way. As you get old, become aged, some of these genes can become nonfunctional. Some—you may not have the same metabolic capacity.

Your kidneys may not work as well, things like that. So you have to take into consideration age certainly whenever you're looking at the effects of drugs and how long they're going to stay in your body.

**The State**: Obviously, the baby Alexis showed signs of this before the death.

**Dr. Eagerton**: Right. The—the lethargy, maybe trouble breathing. I—I don't know how to interpret that exactly, but there [were] some—there were some symptoms that were conveyed that were consistent with morphine toxicity.

**The State**:  And basically if she was continuously breastfeeding and things like that could she reach a level, especially if she didn't metabolize it nearly as fast as the mother, for example, could it reach the levels of toxicology—toxicity of the level [sic]?

**Dr. Eagerton**:  Yes.  And that's one of the things that if you can't metabolize it, then the drug may build up in your body and you become—you have a toxic dose whenever you wouldn't normally have a tox[ic] dose.

Dr. Eagerton's testimony further included the warning on morphine from LactMed[2]:

**Dr. Eagerton**:  "Epidural morphine given to mothers for post[-] cesarean section analgesia results in trivial amounts of morphine in their colostrum and milk.  Intravenous or oral doses of maternal morphine in the immediate postpartum period result in higher milk levels than with epidural morphine.  Labor pain medication may delay the onset of lactation.  *Maternal use of oral narcotics during breastfeeding can cause infant drowsiness, central nervous system depression and even death.*"

(emphasis added).

**Dr. Eagerton**:  "[A]t least some of [the morphine] I believe within a reasonable degree of scientific and medical certainty had to come through the breast milk."

Accepting this evidence as true—as we must under the standard of review—one may reasonably deduce that morphine ingested through breastfeeding "can cause . . . death."  The evidence, scientific and otherwise, further allows a reasonable juror to conclude that Appellant's breast milk was the source of the morphine found in Alexis's body.  Thus, the testimony of Dr. Eagerton provides evidence that, if believed, is sufficient to survive Appellant's directed verdict motion.  The State presented additional evidence.

---

[2] LactMed is a database that provides information and warnings on drugs to which breastfeeding mothers may be exposed.  It is part of TOXNET, a database operated by the National Institute of Health.

Dr. John D. Wren, a pathologist, performed the autopsy on Alexis. Dr. Wren is an experienced pathologist, having performed more than four thousand autopsies. Early in Dr. Wren's testimony, the State established that Alexis's body had no needle marks. Dr. Wren stated that "the only way this child could have gotten that much [morphine] would be orally, because I saw no injection sites. . . . The route of administration had to have been orally." And as Dr. Wren explained, the level of morphine in Alexis was lethal:

> **Dr. Wren**: Then you come to morphine. The level was .52 mg per liter, therapeutic level was .10 to .30 mg per liter. And from my references therapeutics [sic] .001 to .200. Toxic is .3 to 2.5. And lethal is .2 to 7.2.
>
> Now, you'll notice that some of these overlap. It really depends on how the—how accustomed the body is to that drug.[3]

---

[3] This is consistent with Dr. Eagerton's testimony that the line dividing toxic and lethal levels is not an exact demarcation but rather falls within "a range."

Thus, the dissent's misconceptions are twofold. First, the dissent fails to appreciate that the ranges for toxic and lethal levels of morphine are overlapping and that Alexis's level fell within the overlapping area. According to the expert testimony in this case, the level of morphine found in Alexis (.52 mg) could have been classified in either the toxic level (.3 to 2.5 mg) or lethal level (.2 to 7.2 mg); it is simply lethal because it caused her death. Therefore, the dissent's attempt to draw an artificial distinction that there was only evidence showing enough morphine could pass through the breast milk to be "toxic" but not "lethal" is unavailing.

Second, the dissent fails to recognize the expert testimony that a baby is unable to metabolize this type of drug and chronic exposure can lead to a higher level of morphine building up within the body, which can logically result in a lethal level of morphine. It was not necessary to show Alexis received a lethal level of morphine from one dose of breast milk in order to prove the State's causation theory: "the child died as a result of consumption of a controlled substance through the mother's breast milk." The State provided evidence that Appellant was taking morphine and breastfeeding Alexis continuously, morphine can pass from a mother to a baby through breast milk, the level of morphine can build up in a baby due to the inability to process it, and Alexis died from a lethal level of morphine. Contrary to the dissent's assertion, nothing more was required for the jury to make a logical deduction.

. . .

And then in pieds [sic]—I put this in because I had found this later—that the levels that produce surgical analgesia in pediatrics is .046 to .083, which is 46 to 83. Once again, the level reported [in Alexis] is 520. And then of course there's a caveat there. Lethal levels may be higher in individuals under chronic opioid treatment.

If you have a person that's under chronic opioid treatment they're taking in a lot—a lot often and they're—over a long period of time they adjust to the—their body physiology adjusts to that, and they can sustain higher levels without it having an effect on them.

So you have to take into account where the person has a history of that—and of course nobody that comes to the morgue is going to tell you they're taking morphine, and sometimes the family don't tell you either. So we have to take it if they don't have a prescription that they're getting it illegal[ly] or they're taking something else.

So based on all of that *all of these drugs essentially lead to respiratory depression.* And so I said based on the history and autopsy findings—and I should have put in including toxicology results—*it was my opinion that this child died as a result of respiratory insufficiency secondary to synergistic drug intoxication. I could just as easily have said morphine intoxication, but lawyers like to split hairs, and so I included them all.*

(emphasis added).

Dr. Wren's testimony continued:

**The State**: And, Doctor, let me ask you this. Obviously, being a young child, six-and-a-half weeks, her metab—the ability to metabolize drugs, is it much less than an adult?

**Dr. Wren**: That's—that's correct. It builds up.

**The State**:  So it will build up over a period of time if it—if it keeps getting the drugs.

**Dr. Wren**:  Yeah.  If they can't metabolize it'd have to go somewhere.  And there's something called intrahepatic circulation.  If it's excreted into the bile or whatever, it gets into the GI tract, and it's reabsorbed and goes back in[,] it just recirculates.  It's just not eliminated unless she's—has affluent diarrhea or—or urinating all of the time.

**The State**:  So, and the—the mother was taking morphine in this situation and breastfeeding.  Obviously, the baby was getting morphine though the—taking MS Contin actually.

**Dr. Wren**:  At least some, yeah.

**The State**:  Yeah.  From there.  So the baby would get the morphine from the mother.

**Dr. Wren**:  That's correct.

**The State**:  And could then metabolize it as fast as it, you know—in a fast way or was constantly getting it from the breast milk, could it build up in that body?

**Dr. Wren**:  That's right.  I did a couple of calculations.  I'm not as good in my head as I used to be, but I think I might be correct or at least close.  I have one reference here if I can find it.

**The State**:  Yes, sir.  Take your time.

**Dr. Wren**:  It's from toxnet.

**The State**:  Yes, sir.

**Dr. Wren**:  It says—this is a caveat.  "Newborn infants tend to be particularly sensitive to the effects of even small doses of analgesics.  Once the mother's milk come in—comes in it's best to provide pain control with a nonnarcotic analgesic and limit maternal intake of morphine to a few days at a low dosage with

close infant monitoring.  And then if the baby shows signs of increased sleepiness more than usual, difficulty breastfeeding, breathing difficulties, a physician should be contacted immediately."

It goes further to say there's a study here of one mother who was 21 days postpartum, which is about half this one, [who] received oral morphine, 10 mg every six hours, and for four doses.  That's 40 mg.  And then five [milligrams] every six hours for two doses.  So that's actually 50 mg total she got in a 24-hour period.

She had a peak morphine of a hundred micrograms per liter after one hour, and four and a half hours after her first milligram, 5 mg dose.

Using the peak level from this study an exclusively best— breastfed infant would receive 15 micrograms per [] daily[,] equal to about three percent of the maternal daily dose assuming a daily maternal oral morphine dose of 40 mg.

Okay.  So I took 40 mg and took three percent of that.  That comes out to be 1.2 mg.

The baby weighed 3,345 grams, which is 3.345 mg [sic].  And I was doing this in my head, so I got—took three times 1.2.  That's—well, actually I didn't even do that.  I took 1.2 mg and divided that by the volume of blood in a child that age.  The rule of thumb is 75 to 80 milliliters per kilogram.

Okay.  This child weighed, again, 3.345 kilograms, so 3.345 times 75 or 80 comes out to be about .285 liters.  285 milliliters is all the blood that child had in her body, and that has to go into the tissues everywhere in the body.  So the—the blood—you'll have to take my word for it.  It is hard to get 10 ccs of blood out of a child, an infant.  It is really hard.  The younger they are, the harder it is.

And we—a lot of places that do blood toxicology, they want 21 milliliters.  They want three 7-milliliter tubes of blood.  We can't get that.  So we have to send them small amounts.

But, at any rate, if you take the 1.2 mg and divide it by two—.285 you get about 4 mg per liter, which is 4,000 micrograms per liter. So that's—that's a good bit of—when we're talking about micrograms and milligrams, that's a good bit.

Then I found another place in the same article where it says that an exclusively breastfed infant receives—tells what it receives. But it also says the peak morphine in—they did seven women who had preterm deliveries, and they—they gave them 60 mg of morphine in 24 hours cumulative. And they found out that the peak milk morphine varied, was 48 on the average mic—micrograms per liter. And the peak six glucuronide metabolite was 1,084 mg or micrograms per liter, which is also secreted in breast milk.

And it's thought that that—that active drug, the six—the six isomer is actually secreted in the milk too. And in the infant's digestive system it's converted back to morphine, and that is another source of morphine.

Dr. Wren also re-read portions of the LactMed warning on morphine:

> **Dr. Wren**: "Maternal use of oral narcotics during breastfeeding can cause infant drowsiness, central nervous system depression[,] and even death. Newborn instant—infants seem to be particularly sensitive to the effects of even small do[s]es of narcotic analgesics and limited maternal intake of morphine to a few—to a few days at a low dosage with close infant monitoring is best to provide pain control and limited maternal intake to a few days at low dosage."

The defense stressed the lack of studies and peer-reviewed articles linking drug-related infant deaths to breastfeeding. Dr. Wren provided a common sense explanation:

> **Dr. Wren**: I don't—I don't think anybody in here would subject [a] child to an ongoing test like that.

In sum, the State presented evidence that Appellant continuously ingested substantial doses of morphine and other drugs while pregnant and breastfeeding;

that morphine and other drugs can and do pass from a nursing mother to a breastfeeding child through breast milk; that infants cannot metabolize morphine and other drugs effectively; that Alexis exhibited symptoms consistent with morphine toxicity; and that Alexis's death was caused by respiratory failure secondary to synergistic drug intoxication.

As noted, we are mandated when reviewing the denial of a directed verdict motion to view the evidence in a light most favorable to the State. When examined through the proper lens, the State presented ample evidence that would permit the jury to logically and reasonably conclude that Appellant's morphine consumption while breastfeeding "place[d] the child at unreasonable risk of harm," S.C. Code Ann. § 63-5-70(A)(1) (2010), and constituted "an act or omission by any person which causes harm to the child's physical health or welfare" resulting in the child's death, S.C. Code Ann. § 16-3-85 (2015). *See State v. McKnight*, 352 S.C. 635, 643–44, 576 S.E.2d 168, 172 (2003) (affirming the denial of a directed verdict motion in a homicide by child abuse action despite an expert's inability to identify "the exact mechanism" through which the cocaine affected the infant's body).[4]

---

[4] We, of course, agree with the dissent that the "State must prove every element of the crime charged." We are convinced the State has done so in this case, sufficient to survive a directed verdict motion. With respect for the dissent, we disagree with its reliance on the law concerning a jury's consideration of circumstantial evidence. It is here that the dissent introduces its view that "additional reasoning" is needed. While the dissent's desired framework may apply to a jury's consideration of circumstantial evidence, it has no place at the directed verdict stage. The reliance on *McCormick on Evidence* section 185 is misplaced, for this section "clarifies the meaning of relevance[,]" not a trial court's consideration of circumstantial evidence at the directed verdict stage. Similarly, the case of *State v. Logan*, cited by the dissent, addressed a challenge to a circumstantial evidence jury charge. 405 S.C. 83, 747 S.E.2d 444 (2013). *Logan* does not remotely touch upon a trial court's consideration of circumstantial evidence at the directed verdict stage. The dissent conflates the standards that apply to a trial court's consideration of circumstantial evidence at a directed verdict motion and a jury's consideration of circumstantial evidence. This conflation of different standards was addressed in *Bennett*, as the Court concluded that "the lens through which a court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." *State v. Bennett*, 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016). Paradoxically, the dissent does acknowledge that "the State presented substantial circumstantial evidence to support its theory that Alexis died as a result

## III.

Appellant argues that, even if causation was shown, the trial court erred in failing to direct a verdict on the homicide by child abuse charge because the State did not prove she acted with extreme indifference.

"A person is guilty of homicide by child abuse if the person . . . causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." S.C. Code Ann. § 16-3-85(A)(1) (2015). For purposes of this statute, we have previously defined "extreme indifference" as "a mental state akin to intent characterized by a deliberate act culminating in death." *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008) (quoting *State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct. App. 2002)).

In this case, sufficient evidence was presented to show that Appellant was addicted to prescription drugs—including morphine—and Appellant knew she should use caution in taking morphine while pregnant or breastfeeding but elected to take it in excessive amounts without a doctor's supervision ensuring Alexis's safety.[5]

The testimony at trial revealed that Appellant began receiving prescription drugs due to injuries sustained in a car accident in 1998. In January 2006, Appellant was pregnant and began seeing Dr. Kooistra to treat a seizure disorder. Notably, Dr. Kooistra did not prescribe any pain medications for Appellant while she was pregnant and tried "to avoid prescribing medications of any sort during pregnancy." In November 2007, Appellant began seeing Dr. Kovacs and receiving

---

of ingesting morphine from [Appellant's] breast milk." The dissent circumvents this undeniable finding by parsing selected portions of the testimony favorable to Appellant and recasting that evidence as the "proper lens." The State must present evidence from which a jury can fairly and logically deduce that the defendant committed the offense charged, and at the directed verdict stage, the evidence must be viewed in a light most favorable to the State, not the defendant.

[5] In addition, the toxicology report revealed that Alexis tested positive for Klonopin (Clonazepam), for which Appellant had a prescription. The pill bottle for this drug, found in Appellant's room on the morning of Alexis's death, specifically instructed, "Do not use if pregnant or suspect you are pregnant or are breastfeeding."

prescriptions for various narcotics. Unbeknownst to Dr. Kovacs, Appellant continued to receive other pain prescriptions from Dr. Kooistra. In March 2010, when Appellant realized that she was pregnant with Alexis, she did not notify either prescribing doctor. In April 2010, Appellant requested to switch her prescription patch—Duragesic—to MS Contin pills, which Dr. Kovacs prescribed as she was unaware that Appellant was pregnant. Dr. Kovacs testified that she would not have prescribed morphine to Appellant had she known of the pregnancy. In addition, Dr. Bridges, Appellant's O.B.G.Y.N. physician, testified that she and her colleagues were unaware that Appellant was taking morphine prior to the birth, during delivery, and postpartum.

Throughout her pregnancy, Appellant failed to disclose that she was pregnant to the doctors prescribing morphine to her and failed to disclose that she was taking morphine to her prenatal doctors. In addition, she routinely omitted the fact that she was taking morphine from the paperwork that she submitted to her doctors. The testimony at trial was that, at the very least, the drug should only be taken under a doctor's supervision so the baby's health could be monitored. Nevertheless, Appellant failed to disclose this important information to any of her doctors.

The morphine addiction and concealment continued after Alexis's birth. In October 2010, Appellant told Dr. Kovacs that she had missed her appointments since receiving the MS Contin prescription in April because she had been so depressed that she could not leave the house—her pregnancy and Alexis's recent birth were never mentioned. One of the State's experts, Dr. Eagerton, testified that the use of morphine during lactation is not recommended. Moreover, in response to whether "the doctors definitely need to know about this," Dr. Eagerton stated, "Absolutely." Again, Dr. Kovacs testified that she would not have given Appellant the medication had she known about the pregnancy and Dr. Bridges testified that no mention of morphine was made during Appellant's postpartum visit. Due to her nondisclosure, the record reveals that Appellant received an additional prescription for MS Contin and continued to breastfeed Alexis.

The morning of Alexis's death, Appellant omitted morphine from the list of her current prescriptions that she provided to the investigators, despite their specific inquiry upon finding the pill bottle in her bedroom. At that time, Appellant only admitted to taking morphine while pregnant with Alexis. When initially questioned by law enforcement, Appellant lied about her morphine addiction. It was only after the autopsy and toxicology reports were finalized and Appellant was interviewed again by Investigator Gary that she told the truth and acknowledged

her addiction.  Specifically, Investigator Gary testified that Appellant "finally admitted she just didn't tell [the doctors] because she was afraid they'd take off [sic] her off the morphine."

Thus, viewing the evidence in the light most favorable to the State, the jury could conclude Appellant acted with extreme indifference in taking the morphine and breastfeeding her child, resulting in Alexis's death.

## IV.

Appellant argues alternatively that if the homicide by child abuse conviction stands, the multiple convictions and sentences for the remaining offenses cannot stand and should be vacated.  Concerning the involuntary manslaughter conviction and sentence, we agree.  As explained below, we find nothing in South Carolina's homicide statutes or law that reflects a legislative intent to deviate from the overwhelmingly prevailing view that the homicide of one person by one defendant is limited to one homicide punishment—one homicide, one homicide punishment.  Concerning the unlawful conduct toward a child charge, we reject Appellant's challenge and affirm, for that entirely separate offense was complete prior to Alexis's death.

## A.

Multiple offenses, including multiple homicide offenses, may be prosecuted in a single trial, but principles inherent in double jeopardy and due process preclude multiple punishments for the same offense.[6]  *See, e.g., State v. Cavers*, 236 S.C. 305, 311–12, 114 S.E.2d 401, 404 (1960) ("It was within the province of the jury to find whether appellant's conduct was negligent or reckless, or neither; if negligent, it would have supported a verdict of guilty of manslaughter, the court having eliminated murder and voluntary manslaughter; if reckless, it sustains the verdict of guilty of reckless homicide, and that finding by the jury is implicit in the verdict.  The jury were instructed that they could not find appellant guilty on both

---

[6] U.S. Const. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . ."); U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law"); S.C. Const. art. I, § 3 ("[N]or shall any person be deprived of life, liberty, or property without due process of law . . . ."); S.C. Const. art. I, § 12 ("No person shall be subject for the same offense to be twice put in jeopardy of life or liberty . . . .").

counts. To sustain this point of appellant would require the court, instead of the jury, to determine whether his conduct was negligent or reckless, if either, which, under the evidence in this case, would be an invasion by the court of the province of the jury. The State cannot be required to elect between counts in an indictment when they charge offenses of the same character and refer to the same transaction, whether or not one charges a common law offense and another a statutory offense." (citations omitted)); *see also Ball v. United States*, 470 U.S. 856, 859, 861 (1985) ("It is clear that a convicted felon may be prosecuted simultaneously for violations of §§ 922(h) and 1202(a) involving the same firearm. This Court has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case. . . . To say that a convicted felon may be prosecuted simultaneously for violation of §§ 922(h) and 1202(a), however, is not to say that he may be convicted and punished for two offenses. Congress can be read as allowing charges under two different statutes with conviction and sentence confined to one. Indeed, '[a]ll guides to legislative intent,' *United States v. Woodward*, 469 U.S. 105, 109, 105 S. Ct. 611-613, 83 L.Ed.2d 518 (1985), show that Congress intended a felon in [the defendant's] position to be convicted and punished for only one of the two offenses." (citations omitted)).

While the South Carolina legislature has manifestly authorized multiple homicide charges for a single homicide, we find no expression of legislative intent authorizing multiple homicide *punishments* for a single homicide committed by a single defendant. As a result, absent legislative intent to the contrary, we follow the prevailing rule—one homicide is limited to one homicide punishment per defendant. *See Ervin v. State*, 991 S.W.2d 804 (Tex. Crim. App. 1999) (collecting cases from various jurisdictions supporting that one person causing one death should result in one murder or homicide conviction); *see also People v. Lowe*, 660 P.2d 1261, 1271 n.11 (Colo. 1983), *abrogated on other grounds by Callis v. People*, 692 P.2d 1045 (Colo. 1984) (collecting "[c]ases holding that a person may be convicted of only one homicide offense for the killing of one person"). "It would be a strange system of justice that would permit the defendant to be sentenced to two . . . sentences for the killing of one person." *People v. Hickam*, 684 P.2d 228, 231 (Colo. 1984) (quoting *Lowe*, 660 P.2d at 1270–71). "[C]onviction of both charges, arising from the slaying of the same person amounts to piling punishment upon punishment. Fundamental fairness precludes such a practice." *Loscomb v. State*, 45 Md. App. 598, 613, 416 A.2d 1276, 1285 (1980).

# B.

## Homicide by Child Abuse and Involuntary Manslaughter

Appellant was indicted on both homicide by child abuse and involuntary manslaughter charges as a result of Alexis's death.

The homicide by child abuse statute reflects the legislature's intent to define and target a specific societal problem—child abuse resulting in death, which further explains why multiple homicide offenses may be *prosecuted* in a single trial.  The statute defines in detail the elements of homicide by child abuse: "caus[ing] the death of a child under the age of eleven while committing child abuse or neglect" where "the death occurs under circumstances manifesting an extreme indifference to human life."  S.C. Code Ann. § 16-3-85(A)(1) (2015).  Conversely, the now codified common law offense of involuntary manslaughter is defined in broad terms, covering unintentional killings from both unlawful conduct that does not naturally tend to place another in danger of death or serious bodily harm and lawful conduct that recklessly places another in danger of harm.  *See, e.g.*, *State v. Sams*, 410 S.C. 303, 309, 764 S.E.2d 511, 514 (2014) ("Involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in either (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the doing of a lawful act with a reckless disregard for the safety of others."); S.C. Code Ann. § 16-3-60 (2015).

In *McKnight v. State*, 378 S.C. 33, 51–52, 661 S.E.2d 354, 363 (2008), we applied the *Blockburger* "same-elements" test and held that involuntary manslaughter is not a lesser included offense of homicide by child abuse.  *See Blockburger v. United States*, 284 U.S. 299 (1932).  In *McKnight*, we stated a defendant charged with homicide by child abuse was not entitled to a jury charge on involuntary manslaughter because "the elements of involuntary manslaughter will never be included in the greater offense of homicide by child abuse."  *Id.* at 52, 661 S.E.2d at 363.  The lawful-conduct-in-a-criminally-negligent-manner prong could not apply because child abuse is not lawful.  *Id.* at 51–52, 661 S.E.2d at 363.  Further, the unlawful-conduct version of involuntary manslaughter could not apply because "child abuse could never be defined as an unlawful activity not tending to cause death or great bodily harm."  *Id.* at 52, 661 S.E.2d at 363 (internal quotation marks omitted).

This issue is presented to us in an unusual posture. While both homicide charges were properly presented to the jury, the jury was not instructed in accordance with Appellant's proper request—Appellant could not be found guilty of both homicide by child abuse and involuntary manslaughter. In this situation, the jury should have been instructed that, depending on their view of the evidence, they could find Appellant not guilty of both homicide offenses, guilty of homicide by child abuse, or guilty of involuntary manslaughter—but may not find Appellant guilty of both homicide charges. The State erroneously contends both homicide convictions and punishments should stand.

The flaw in the State's argument on appeal is best understood by reviewing its theory of criminal liability as the trial unfolded. After indicting Appellant on varying homicide charges (which as a matter of law could not be premised on one theory of liability), the State ultimately elected to pursue a single theory of liability—Alexis's death from morphine poisoning was caused by the morphine in Appellant's breast milk—and the trial court instructed the jury, "That applies to each of the separate charges." The jury could have accepted Appellant's view of the evidence and found Appellant not guilty of homicide by child abuse. Specifically, the jury could have concluded the State failed to prove Appellant "committed a deliberate or intentional act under circumstances revealing an extreme indifference to human life."[7] In that scenario, the jury may have nevertheless found Appellant guilty of involuntary manslaughter.[8] But the jury's guilty verdict on Count One in the indictment—homicide by child abuse—precluded a guilty verdict on the charged offense of involuntary manslaughter in

---

[7] This language is from the trial court's jury charge on homicide by child abuse.

[8] The trial court's charge on involuntary manslaughter included the instruction, "Unintentional means that the defendant did not intend to kill the child nor did the defendant intend to inflict serious bodily harm or injury to the deceased child." A finding that Appellant's conduct satisfied this standard would be consistent with Appellant's argument that it is safe for breastfeeding mothers to take morphine. However, it would be inconsistent with a finding that Appellant "committed a deliberate or intentional act under circumstances revealing an extreme indifference to human life."

Count Two. Thus, under these circumstances, a conviction and sentence for each homicide charge cannot stand.[9]

The situation here should be contrasted with a homicide that would properly fall within multiple homicide statutes. In that situation, a jury may properly return a guilty verdict on more than one homicide charge. In *State v. Easler*, 327 S.C. 121, 489 S.E.2d 617 (1997), this Court affirmed convictions and sentences for two homicide charges—felony driving under the influence causing death and reckless homicide—arising out of a motor vehicle accident that killed one person and seriously injured another. The evidence and theory of criminal liability satisfied the elements of both homicide statutes. *Easler*, however, went further and affirmed multiple punishments for the single homicide committed by one defendant, and this was error. We overrule *Easler* to the extent it authorizes multiple homicide punishments involving only one homicide.

It is because of this rule—one homicide, one homicide punishment—that even were we to accept the State's argument that the involuntary manslaughter guilty verdict should stand, an additional sentence for Alexis's death could not stand. The fact that Appellant received a concurrent five-year sentence for involuntary manslaughter does not change the result. The concurrent sentence likely reflects the learned trial judge's inherent understanding that a consecutive sentence could not be imposed. Yet the conviction itself is considered a punishment and that, too, must be vacated. *Ball v. United States*, 470 U.S. 856, 864–65 (1985) ("The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. . . . Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.").

## V.

Appellant's final challenge is the claim of error in the trial court's refusal to "require the State to open fully on the law and the facts of the case [in closing argument] and replying only to new arguments of defense counsel." We affirm pursuant to Rule 220, SCACR, and the following authority: *State v. Beaty*, Op.

---

[9] This is the very argument made by defense counsel to the trial court, as he argued, "it's very inconsistent for the jury to have found that, one, [Appellant] was simply negligent, or, two, grossly negligent, or, three, extreme indifference, because there are different standards requiring different—different things."

No. 27693 (S.C. Sup. Ct. filed Apr. 25, 2018) (Shearouse 2018 Adv. Sh. No. 17 at 57).

## VI.

In sum, the homicide by child abuse and unlawful conduct toward a child convictions and sentences are affirmed; the involuntary manslaughter conviction and sentence is vacated; and we find no error in the order and manner of closing arguments.

**AFFIRMED IN PART, VACATED IN PART.**

**BEATTY, C.J., HEARN and JAMES, JJ., concur.  FEW, J., concurring in part and dissenting in part in a separate opinion.**

**JUSTICE FEW:**  I concur in sections III, IV, and V of the majority opinion.  I also concur with the conclusion the majority reaches in section II that Greene's conviction for unlawful conduct toward a child must be affirmed.  I disagree, however, that we may affirm Greene's homicide convictions.  On this point, for the reasons I will explain, I dissent.

## I.

The State argues it is not required to prove scientific facts with expert testimony as we require civil plaintiffs to do.  The State is mistaken.  The State must prove every element of the crime charged, *State v. Attardo*, 263 S.C. 546, 550, 211 S.E.2d 868, 870 (1975), and when establishing any one element requires the State to prove a fact that is beyond the common understanding of lay people, the State must prove that fact by expert testimony, *see Graves v. CAS Medical Systems, Inc.*, 401 S.C. 63, 80, 735 S.E.2d 650, 659 (2012) ("In some design defect cases, expert testimony is required . . . because the claims are too complex to be within the ken of the ordinary lay juror."); *Watson v. Ford Motor Co.*, 389 S.C. 434, 445, 699 S.E.2d 169, 175 (2010) (stating "expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge"); *see also Green v. Lilliewood*, 272 S.C. 186, 192, 249 S.E.2d 910, 913 (1978) (holding that unless the subject is a matter of common knowledge, expert testimony is required to establish that a defendant failed to conform to a required standard of care in a medical malpractice case); *Kemmerlin v. Wingate*, 274 S.C. 62, 65, 261 S.E.2d 50, 51 (1979) (holding in a public accounting malpractice action: "Since this is an area beyond the realm of ordinary lay knowledge, expert testimony usually will be necessary to establish both the standard of care and the defendant's departure therefrom.").

## II.

The State's theory of how Greene caused Alexis's death was narrow:[10] Greene took morphine and other medications while breastfeeding, the morphine passed through

---

[10] In all prosecutions for homicide, the State must prove the defendant caused the death of the victim.  *See State v. McIver*, 238 S.C. 401, 406, 120 S.E.2d 393, 395 (1961) ("In a homicide case, the corpus delicti consists of two elements—the death of the person killed, and its causation by the criminal act of another.").  *McIver* was a manslaughter case, 238 S.C. at 403, 120 S.E.2d at 393, and the causation element

Greene's breast milk, and Alexis died as a result of morphine intoxication.[11]  The trial court charged the jury,

> The State has the burden of proving these crimes, but it involves the ingestion of the controlled substance by the child through the child's mother's breast milk.  That's the State's allegation and theory in the case, that the child died as a result of consumption of a controlled substance through the mother's breast milk.  That applies to each of the separate charges.

The State had no difficulty proving Greene was taking morphine while breastfeeding, and that Alexis died from morphine intoxication.  The issue, therefore, is whether the State proved the morphine that killed Alexis came from Greene's breast milk.

### A.    Circumstantial Evidence of Causation

On this point, as the majority has explained in detail, the State presented substantial circumstantial evidence, which we view in the light most favorable to the State.  *State v. Pearson*, 415 S.C. 463, 470, 783 S.E.2d 802, 806 (2016).  The majority has recited the strongest circumstantial evidence in the record that supports the State's theory of causation, but to be fair, there is even more than what the majority has included.  In fact, the circumstantial evidence that Alexis died from ingesting morphine through Greene's breast milk appears overwhelming, until we pose the scientific question of whether it is even possible for enough morphine to pass through breast milk to kill a child.

---

is specifically included in the statute governing homicide by child abuse, S.C. Code Ann. § 16-3-85(A) (2015).

[11] The State began the trial with alternative theories of causation.  The first theory was that Greene administered morphine directly to Alexis.  At the conclusion of all evidence, however, the State elected not to proceed on the basis of a direct transfer of morphine, and the trial court directed a verdict for Greene on that theory.

## B.    Circumstantial Evidence Cases

The use of circumstantial evidence to prove guilt in criminal trials contemplates that "even if the circumstances depicted are accepted as true, additional reasoning is required to reach the desired conclusion."  Kenneth S. Broun et al., *McCormick on Evidence* § 185, at 397 (Hornbook Series, 7th ed. 2014).  In *State v. Logan*, 405 S.C. 83, 747 S.E.2d 444 (2013), we described the "evaluation of circumstantial evidence" and stated it "requires jurors to find that the proponent of the evidence has connected collateral facts in order to prove the proposition propounded—a process not required when evaluating direct evidence."  405 S.C. at 97, 747 S.E.2d at 451; *see also* 405 S.C. at 97-98, 747 S.E.2d at 451 ("Analysis of circumstantial evidence is plainly a more intellectual process.").  In every circumstantial evidence case in which this Court affirmed the sufficiency of the evidence, the "additional reasoning" required to "connect[] collateral facts in order to prove the proposition propounded" was such that a lay juror could readily conduct the reasoning and make the connection.  In those cases, the "intellectual process" through which the jury could reasonably infer the guilt of the defendant from the circumstances proven by the State involved a chain of inferences that lay jurors were fully capable of navigating.

In *Pearson*, for example, the State proved the following circumstances: the suspects fled the victim's home in the victim's stolen El Camino, and Pearson's fingerprint was found in the truck's bed where the victim saw one of the suspects sitting; Pearson lied about ever having been to the victim's house when he had previously done considerable landscaping work there; and Pearson lied about knowing the co-defendant whose DNA was found on the duct tape on the victim's head.  415 S.C. at 465-69, 473-74, 783 S.E.2d at 803-05, 808.  From those circumstances, a lay juror could readily conclude through a chain of non-scientific inferences that Pearson was one of the people who robbed and beat the victim.  We found "the evidence could induce a reasonable juror to find Pearson guilty."  415 S.C. at 474, 783 S.E.2d at 808.

In *State v. Bennett*, 415 S.C. 232, 781 S.E.2d 352 (2016), the State proved the following circumstances: Bennett's blood was found on the floor directly beneath the spot from which a television was stolen from a public building; his fingerprint was found on another television the suspects had attempted to steal from the "community room" of the building; and though Bennett "was known to frequent" the room in which his blood was found, "[t]estimony suggested Bennett would have no reason to be in the community room."  415 S.C. at 234-35, 237, 781 S.E.2d at 353, 354.  From those circumstances, a lay juror could readily conclude

through a chain of non-scientific inferences that Bennett committed the burglary, malicious injury, and larceny. We found "the evidence could induce a reasonable juror to find Bennett guilty." 415 S.C. at 237, 781 S.E.2d at 354.

In *Pearson*, *Bennett*, and every other case in which this Court found the State's presentation of purely circumstantial evidence sufficient to survive a motion for directed verdict, a jury was fully capable of performing the "additional reasoning . . . required to reach the desired conclusion" by using its common knowledge, experience, and understanding.[12] In each of those cases, therefore, we focused only on the State's proof of collateral facts or circumstances—not on the inferences to be drawn from those facts or circumstances—and we found the State's proof of the circumstances sufficient to support the fact inferred.

### C.     The Circumstantial Evidence Standard

In *Bennett*, we reiterated that when reviewing the sufficiency of circumstantial evidence, "The Court's review is limited to considering the existence or nonexistence of evidence, not its weight." 415 S.C. at 235, 781 S.E.2d at 353 (citing *State v. Cherry*, 361 S.C. 588, 593, 606 S.E.2d 475, 478-79 (2004)). We criticized the court of appeals in *Bennett* for considering a "plausible alternative theory" because doing so is "contrary to our jurisprudence and misapprehends the court's role" compared to the role of the jury. 415 S.C. at 236, 781 S.E.2d at 354. We held "the trial court . . . must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" 415 S.C. at 236-37, 781 S.E.2d at 354 (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955)).

In this case, the State presented substantial circumstantial evidence to support its theory that Alexis died as a result of ingesting morphine from Greene's breast milk, and abandoned any alternative theory of causation. Therefore, under *Bennett* and the long line of cases upon which it relies, our task is limited to the second step in the *Bennett/Littlejohn* analysis. The question before us under that second step is

---

[12] *See generally Holland v. Georgia Hardwood Lumber Co.*, 214 S.C. 195, 204, 51 S.E.2d 744, 749 (1949) (discussing circumstantial evidence in a workers' compensation case, and stating, "The facts and circumstances shown should be reckoned with in the light of ordinary experience, and such conclusions deduced therefrom as common sense dictates.").

whether a reasonable jury could "fairly and logically" conclude from the circumstances proven that the State established the causation element under its theory. This, in turn, requires us to determine if the chain of inferences the jury must follow to reach this conclusion may be completed by the jury using its common knowledge, experience, and understanding, or whether expert testimony should be required.

Greene argues the jury could not fairly and logically complete this second step because, in the course of its analysis, the jury would necessarily consider whether it is even possible that a breastfeeding mother can transmit morphine through her breast milk in sufficient concentration to cause the death of a child. Green argues the means of answering this question are beyond the common knowledge, experience, and understanding of a lay juror. Therefore, Greene argues, expert testimony was required to establish the causal connection between morphine in the mother's breast milk and Alexis's death. Specifically, Greene argues the State was required to present an expert opinion that morphine—by itself or synergistically with other drugs—passed through her breast milk to kill Alexis.

I agree with Greene. In reaching this conclusion, I find it particularly important that the State's own expert witnesses refused to state the morphine that killed Alexis came from Greene's breast milk, or even whether that was possible. The reader may repeatedly scour the majority's outstanding recitation of the State's expert testimony—or the record from which it came—but will not find any testimony that comes close to such a statement. In fact, as I will explain, the State's two experts openly avoided answering this question. In addition, the circumstances proven at trial, considered in the light most favorable to the State, include the fact that reliable medical organizations and journals have stated it can be "safe" to take morphine while breastfeeding a child. Finally, the record in this case does not include even one instance documented in medical literature of a lethal level of morphine in a child that resulted from a breastfeeding mother taking morphine.

## D. Expert Testimony on Causation

The State presented the testimony of two experts. David H. Eagerton, Ph.D., is an assistant professor of pharmacology and founding faculty member at the Presbyterian College School of Pharmacy and the former chief toxicologist at the South Carolina Law Enforcement Division. His doctoral degree is in pharmacology, and he is board certified in forensic toxicology. Dr. Eagerton gave an extensive explanation of the numerous drugs found in Alexis's body after her

death, including what he considered to be a lethal level of morphine, and how the combination of those drugs can work synergistically to increase the toxic effects of the drugs in the blood. He explained how drugs are absorbed into the body and that infants do not metabolize quickly because their liver has not yet developed. At one point, Dr. Eagerton testified a six-week old child like Alexis typically does not metabolize "at all."

The State then asked, "If she was continuously breastfeeding . . . could [Alexis] reach a level, especially if she didn't metabolize it nearly as fast as the mother, could it reach the levels of toxicology -- toxicity of the level?" Dr. Eagerton answered, "Yes." Dr. Eagerton went on to explain Alexis showed symptoms that were "consistent with morphine toxicity." He testified morphine may build up in a child's body to become "toxic." But Dr. Eagerton distinguished "toxic" from "lethal." Toxic means it will make you sick; lethal means it will kill you. There was never any dispute that morphine in breast milk could make a child sick. In fact, the label on the package states morphine "passes into the breast milk and may harm your baby."

On cross-examination, Dr. Eagerton acknowledged several articles in the medical literature that list morphine as "safe to take while breastfeeding," and conceded "based upon [his] research" he was not aware of any documentation in the medical literature "that ever says a mother taking morphine can create a toxic level of morphine in the child through breast milk." Counsel showed Dr. Eagerton a 2012 article from the journal *Clinical Toxicology* entitled, "Is Maternal Opioid Use Hazardous to Breastfed Infants," and the following dialogue took place,

> Q: Look on page six of this journal. And this is a peer-reviewed journal, correct?
>
> A: That's right.
>
> . . . .
>
> Q: Look there if you would on this highlighted portion . . . [and] read that to us.
>
> A: "The medical literature describes scant evidence of opioid toxicity in breastfed infants."
>
> Q: Do you have any evidence that's contrary to that?

A:    No, sir. . . .

. . . .

Q:    So there is scant evidence?

A:    That is correct.

Q:    Which is pretty close to none.

A:    Yes, sir.

. . . .

Q:    *So you are in no position to say then that that number*[13] *came through breast milk?*

A:    *I don't believe I've said one way or the other. Nobody's asked me.*

Q:    But you don't have any basis for saying that it came through breast milk?

A:    Had to get into the baby somehow.

Q:    That's not my question. You have no basis for saying that number came into the baby through breast milk?

A:    I don't know that I'd say I have no basis. I'd say the basis is the mother is taking . . . morphine. She is breastfeeding. We know that based on the literature we've already talked about that at least small amounts certainly do pass through into the

---

[13] The question refers to the number 0.52 mg/L, the concentration of morphine measured in Alexis's blood after her death. Dr. Eagerton testified he considered that a lethal level of morphine.

breast milk.  So I don't think I have a basis to say
that it didn't, or at least some of it.

The strongest testimony Dr. Eagerton gave on the causation question came when he read from the LactMed database[14] on the TOXNET internet site maintained by the National Institutes of Health in its National Library of Medicine.  He testified, "Maternal use of oral narcotics during breastfeeding can cause infant drowsiness, central nervous system depression and even death."  However, Dr. Eagerton was careful never to say that the morphine that came from Greene's breast milk killed Alexis—that it was "lethal."  In fact, he was specifically asked, "So, you cannot make a conclusion today as to how that morphine got into the baby?"  He replied, "No, sir.  I think I can make a conclusion . . . at least some of it . . . had to come through the breast milk."  When pressed as to whether morphine could get to a specific toxicity level from breastfeeding, however, he stated, "Like I said earlier, I can't quantitate how much."

The State's other expert was John David Wren, M.D., the pathologist who performed the autopsy.  Dr. Wren testified Alexis had lethal levels of morphine, "It's lethal in the brain, it's lethal in the liver, it's lethal in the blood."  He explained, "it was my opinion that this child died as a result of respiratory insufficiency secondary to synergistic drug intoxication.  I could just as easily have said morphine intoxication."  However, Dr. Wren testified, "*It's not my opinion that it was from milk or anything else*.  I just know that it was there."  On cross-examination, Dr. Wren testified, "*I don't know how it got there*.  It's unquestionably there.  And you can argue any mechanism you want, but it's there, period."

### E.      The "Proper Lens"[15]

This case is different from *Logan*, *Bennett*, and every other circumstantial evidence case this Court has decided.  The majority's suggestion that I have "conflated" the roles of judge and jury ignores that difference.  None of those previous cases involved scientific questions, so the lay jury was fully capable of making all the necessary inferences on its own, "fairly and logically."  *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354.  The issue before the Court in those cases, therefore, arose only

---

[14] The LactMed database contains information on drugs and other chemicals to which breastfeeding mothers may be exposed.

[15] The term "proper lens" is taken from the majority opinion, slip op. at 12.

under the first step of the *Bennett*/*Littlejohn* analysis—whether the circumstantial evidence met the "any substantial evidence" standard. That is not the issue we face in this case. As I have stated, the circumstantial evidence in this case that Alexis died from ingesting morphine through Greene's breast milk appears overwhelming.

The issue in this case arises under the second step of the *Bennett*/*Littlejohn* analysis—whether the "additional reasoning" required to infer from the circumstances proven that the morphine that killed Alexis came from Greene's breast milk required the jury to answer a scientific question beyond its common knowledge, experience, or understanding. It is the same question we addressed in *Graves*, *Watson*, *Green*, and *Kemmerlin*. Although *Watson*, *Green*, and *Kemmerlin* were not circumstantial evidence cases, *Graves* was a circumstantial evidence case. In this respect, this case is identical to *Graves*. We said in *Graves*—just like I say here—this case is not about the State's proof of sufficient circumstances, or "what quantum of circumstantial evidence . . . is necessary" to present a jury question. 401 S.C. at 80, 735 S.E.2d at 658.

In *Graves*, we first found the plaintiffs failed to present admissible testimony of an expert on the existence of a defect in a products liability case. 401 S.C. at 75-78, 735 S.E.2d at 656-57. We then turned to whether the plaintiffs nevertheless presented sufficient circumstantial evidence to reach a jury. We stated "the Graves have no direct evidence," and "[t]hus, the question is whether the record contains sufficient circumstantial evidence of a defect required to survive summary judgment." 401 S.C. at 79, 735 S.E.2d at 658. Focusing on the second part of the *Bennett*/*Littlejohn* analysis for circumstantial evidence, we stated "we need not determine what quantum of circumstantial evidence of a design defect is necessary to withstand summary judgment because the lack of expert testimony is . . . dispositive." 401 S.C. at 80, 735 S.E.2d at 658. "In some design defect cases," we held, "expert testimony is required . . . because the claims are too complex to be within the ken of the ordinary lay juror." 401 S.C. at 80, 735 S.E.2d at 659 (citing *Watson*, 389 S.C. at 445, 699 S.E.2d at 175).

Thus, as in *Graves*, the "proper lens" invoked by the majority forces us to examine whether the State has satisfied the second prong of the *Bennett*/*Littlejohn* analysis. Through this lens we must determine whether a lay juror can comprehend the scientific possibility that morphine—even acting synergistically with other drugs—may pass through a mother's breast milk in sufficient quantity to kill a child. Greene's counsel repeatedly pressed both Dr. Eagerton and Dr. Wren as to whether there is any scientific documentation supporting the theory that this is even possible. At one point, Dr. Eagerton responded, "I don't believe I've seen any

literature that says that. But for everything there's got to be a first." Dr. Wren responded, "No. But, . . . there is a first time for everything."

These answers demonstrate the narrow point upon which I would reverse Greene's homicide convictions. If medical and scientific professionals have nothing more definitive to say as to whether the factual premise of the State's theory is even possible, then we should not permit a lay jury to base a verdict in a criminal trial on the premise. One day there may be a "first" who says morphine can do what the State argues it did here, but it should be a medical or scientific professional, not a jury in a criminal case.

### III.

I agree with the majority that Greene's conviction for unlawful conduct toward a child must be affirmed, and that under any circumstance both convictions for homicide cannot stand. However, I would find the trial court erred in not directing a verdict on the homicide charges because the State failed to present evidence of causation "sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt." *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354.